IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00779–AP

GAYLE FRANCAVILLA,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner, Social Security Administration,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

      This is a social security benefits appeal.  Plaintiff Gayle Francavilla challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying her application

for social security disability benefits.  Jurisdiction is premised upon 42 U.S.C. § 405(g).

## FACTS

***1.    Medical Evidence***

      Plaintiff was born on January 23, 1954, and was forty-two years old at the onset of her

alleged disability.  (Admin R. at 49 [filed July 26, 2007] [hereinafter "Admin R."].)  Plaintiff has

a GED and an associate's degree in paralegal studies, and has worked in the vocationally

relevant past as an office clerk, secretary, window cleaner, paralegal, and the assistant manager

of a convenience store. (*Id.* at 63, 69.) Plaintiff alleges that she became unable to work on April 9, 1996, due to back and neck problems associated with an automobile accident. (*Id*. at 63.)

On April 12, 1996, three days after her accident, Plaintiff presented to a chiropractor, Donald E. Freuden, D.C., complaining of headaches, neck pain, shoulder pain, and mid-back pain. (*Id*. at 149.) Dr. Freuden assessed Plaintiff with sprain injuries, muscle spasms, and post-traumatic headache, but an X-ray taken three days later revealed no evidence of fracture or dislocation. (*Id.* at 150, 155.) From April 15 to June 10, 1996, Dr. Freuden provided "trigger point therapy," treated Plaintiff with ultrasound, and gave her spinal adjustments. (*Id*. at 126–55.)

On April 17, 1996, Dr. Freuden referred Plaintiff to George Leimbach, M.D., a specialist in physical medicine. (*See id.* at 181–84.) Dr. Leimbach assessed Plaintiff with sprains, headaches, and "subjective vertigo/dizziness." (*Id.* at 183.) Every two weeks until June 26, 1996, Plaintiff returned to Dr. Leimbach for treatment that included trigger point injections, medication for her headaches, and ongoing physical therapy. (*Id.* at 159–81.) On July 3, 1996, a magnetic resonance imaging ("MRI") scan of Plaintiff's brain revealed nonspecific findings. (*Id*. at 226–27.)

On July 31, 1996, Plaintiff began treatment with David R. Silva, D.O. (*Id.* at 301.) Dr. Silva assessed Plaintiff with neck and back strains, muscle tension with related headaches, and occipital neuralgia.[1] (*Id.* at 303.) To treat these problems, Dr. Silva recommended trigger point

---

[1]Occipital neuralgia is a "clinical condition marked by pain and tenderness in the neck, tight neck muscles, blurred vision, and dizziness." *See* 4–O J.E. SCHMIDT, M.D., ATTORNEYS'

injections including occipital nerve blocks, physical therapy, and medication for Plaintiff's headaches. (*Id.*) Over the next fourteen months, Plaintiff returned to Dr. Silva approximately every month while simultaneously undergoing physical therapy. (*See id.* at 230–39, 252–62, 284–300, 427–54, 526–44.)

Throughout his treatment of Plaintiff, Dr. Silva adjusted medication for her headaches and muscle spasms, and provided trigger point injections in her back and neck. (*See id.* at 284–300.) By November 1996, Plaintiff's physical examination revealed "much improved" range of motion in her neck, and Dr. Silva noted that, "[a]t this time her headaches seem to be the majority of her symptoms." (*Id.* at 295.)

By February 1997, Plaintiff said that the intensity of her headaches was slowly declining, but reported numbness and pain in her legs and feet. (*Id.* at 291.) In April 1997, an electromyography ("EMG") and nerve conduction study ordered by Dr. Silva in response to these complaints found nothing unusual. (*Id.* at 289–90.)

In July 1997, Plaintiff reported that her leg gave out from under her due to numbness, and that she fell in her driveway. (*Id.* at 287.) Dr. Silva noted bruising. (*Id.*) By August 1997, Plaintiff reported that her lower-back pain and left leg pain had grown worse as a result of this fall. (*Id.* at 286.) In September 1997, Dr. Silva reviewed the results of an MRI scan with Plaintiff which showed "no obvious change." (*Id.* at 285.) A further CT scan and myelogram of

---

DICTIONARY OF MEDICINE 261 (Matthew Bender 2005) (hereinafter "DICTIONARY OF MEDICINE").

Plaintiff's lower back also performed in September 1997 revealed nothing usual.[2]  (*Id.* at 360–61.)

On November 17, 1997, Dr. Silva noted that, having reviewed Plaintiff's CT scan, myelogram, and EMG and nerve conduction study, he had "no good explanation why [Plaintiff] is experiencing the symptoms she is having and in fact worsening."  (*Id.* at 282.)  An EMG performed on December 1, 1997, came back normal.  (*See id.* at 240–41.)

On February 9, 1998, Stephen Dinenberg, M.D., performed an independent medical evaluation of Plaintiff in which he concluded that she had neck strain.  (*Id.* at 513.)  Dr. Dinenberg gave a prognosis of complete recovery in three to six weeks.  (*Id.*)  On August 31, 1998, Christopher J. Centeno, M.D., opined in response to an inquiry by an attorney that Plaintiff had "left [sarcoiliac] joint and piriformis syndrome."[3]  (*Id.* at 319.)

On September 9, 1998, Dr. Silva opined in a letter to an attorney that Plaintiff had "chronic low back pain, chronic lumbar strain and chronic sacroiliac joint dysfunction with lower extremity referred pain."  (*Id.* at 277.)  Dr. Silva further stated that "[Plaintiff's] limitation would likely . . . place her in the light duty category work activity with a maximum lift capacity of approximately [twenty] pounds on an occasional basis, [ten]–[fifteen] pounds on a constant

---

[2]A myelogram is an X-ray of the spinal cord, "especially one made after the injection of a contrast substance."  4-M DICTIONARY OF MEDICINE 6977.

[3]Piriformis syndrome is a "condition in which the piriformis muscle . . . exerts pressure on the sciatic nerve, eliciting pain, tingling, weakness of muscles of the lower limb, etc."  4-P DICTIONARY OF MEDICINE 5808.

basis," and that she would have "some sitting and standing tolerance limits as well."  (*Id.* at 277–78.)

On March 29, 2000, Alan Ketelhohn, M.D., a state agency physician, assessed Plaintiff's residual functional capacity ("RFC") as of the date she was last insured, September 30, 1997. (*Id*. at 111–18.)  Dr. Ketelhohn found that Plaintiff could: (1) lift and/or carry twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit with normal breaks for about six hours in an eight-hour workday; and (4) had no restrictions in her abilities to push and/or pull.  (*Id.* at 112.)  Dr. Ketelhohn further found that Plaintiff could frequently climb, balance, kneel, crouch, and crawl, and occasionally stoop. (*Id.* at 113.)  Dr. Ketelhohn imposed no manipulative, visual, communicative, or environmental limitations.  (*Id.* at 114–15.)

On December 31, 2002, Dr. Silva wrote a letter addressed "To Whom It May Concern," in which he recounted his perception of Plaintiff's RFC as of the date of her first visit to him, and continuing through the date of his letter.  (*Id.* at 653–54.)  As Dr. Silva recounted:

> As early as July 1996, I considered her in the sedentary to very light duty category work activity.  Restrictions at that time included no sitting or standing for greater than [ten]–[fifteen] minutes at a time without changing positions. Because of the cervical pain she has the inability to sit at a desk or perform any desk type work for greater than [ten]–[fifteen] minutes at a time without changing positions.  Neck range of motion, pain and discomfort limit her ability to perform any type of desk or computer work again for longer than [ten] minutes at [sic] time and low back pain and symptoms . . . prevent her from sitting for greater than [five]–[ten] minutes at a time before changing positions.  Her lifting capacity is limited to [five]–[ten] pounds at any one time and I do not feel she can lift more than this more than a few times per day.  Chronic static positioning seems to be her worse [sic] aggravator in terms of increasing neck and low back pain and these static positions should be avoided at all costs.

(*Id.* at 653–54.)

**2.      *Procedural History***

On December 6, 1999, Plaintiff applied for disability insurance benefits.  (*Id.* at 49–52.)

On April 6, 2000, the Social Security Administration denied Plaintiff's application.  (*Id.* at

36–40.)  On April 26, 2000, Plaintiff requested a hearing before an administrative law judge

("ALJ").  (*Id.* at 41–42.)  On August 13, 2001, an ALJ held a hearing.  (*Id.* at 655–705.)  On

October 17, 2001, the ALJ issued a decision reflecting his finding that Plaintiff was not disabled

within the meaning of the Social Security Act ("SSA").  (*Id.* at 8–30.)  On June 13, 2003, the

Appeals Council affirmed the ALJ's decision.  (*Id.* at 7–9.)

On February 9, 2005, this court reversed the Commissioner's decision and remanded for

a new hearing on evidence that was not before the ALJ at the time of his decision, but which is

referenced above.  (*Id.* at 726.)  On August 17, 2006, a new ALJ held a new hearing at which

Plaintiff and a vocational expert ("VE") testified.  (*Id.* at 782–819.)  Plaintiff was represented by

counsel.  (*Id.* at 782.)

At the hearing, Plaintiff testified that she was married and lived with her husband.  (*Id.* at

788.)  She had not worked since her automobile accident in April 1996, and did not believe she

could perform any of her past jobs.  (*Id.* at 790, 792.)

Plaintiff's biggest physical complaint was pain in her left leg, and she testified that sitting

for long periods made her leg go numb.  (*Id.* at 792.)  Plaintiff also testified that she got extreme

headaches if she put her head down for extended periods, and that she usually got headaches

once a month.  (*Id.* at 793.)  Plaintiff admitted that pain medication helped her headaches, but stated that such medication just "[took] the edge off."  (*Id.* at 793–94.)

Plaintiff asserted that she could walk about three quarters of a mile, but said that she could only walk for ten or fifteen minutes at a time in a job setting.  (*Id.* at 795.)  She testified that she could only sit for about fifteen or twenty minutes at a time without her leg going numb.  (*Id.* at 796.)  Plaintiff believed she could stand for fifteen or twenty minutes at a time, but said that she could not climb stairs very well.  (*Id.*)  Plaintiff took three naps or extended rests every day for approximately sixty to ninety minutes in order to relieve the numbness in her leg and to stop her back from hurting.  (*Id.* at 799.)

Plaintiff claimed she could only reach over her shoulders "somewhat" due to tension in the back of her neck.  (*Id.* at 797.)  She stated she: (1) could bend about twenty-five degrees; (2) could not stoop because she did not "have enough strength in [her] legs" to get back up; and (3) could not kneel.  (*Id.* at 798.)  She believed she could lift and carry about ten pounds, but only once in a while.  (*Id.*)

Plaintiff acknowledged that she could shop, but explained that she did so at Wal-Mart because the store had benches she could use to rest.  (*Id.* at 799–800.)  Plaintiff said that she could only carry "light bags" of groceries.  (*Id.* at 800.)  Plaintiff performed "light housework" such as washing dishes, but said that so doing took her "a good hour and a half" because she had to alternate between sitting and standing.  (*Id.*)  Plaintiff said she could not make her bed without difficulty.  (*Id.* at 801.)

Plaintiff admitted that she could drive for about an hour without difficulties, and that she made "short runs" into town in her car several times a week. (*Id.*) She also said she could pump gas without difficulty. (*Id.* at 802.)

Plaintiff testified that she currently engaged in camping. (*Id.*) During such trips, she did a "bit of walking," and played games inside her camper. (*Id.* at 803.) She also did a little crocheting and reading, played with her grandkids, and occasionally went to dinner with friends. (*Id.*) Plaintiff nonetheless stated that her alleged disability prevented her from doing things like "camping, hunting, fishing, crocheting, a lot of reading, and picking up [her] grandkids." (*Id.* at 804.)

Plaintiff said that she had last fished about seven years earlier, but that she still got a license every year "just in case one day [she] might go." (*Id.* at 804–05.) Upon further questioning by the ALJ, Plaintiff acknowledged that she currently did do a little fishing. (*Id.* at 805.) Plaintiff said she was fine watching television and movies. (*Id.* at 806.)

Upon examination by her counsel, Plaintiff stated that her shin bones hurt "a couple times a month" for three or four days at a time. (*Id.* at 808.) She stated that she could not go to the doctor more than she did for financial reasons, but that she accommodated her pain by alternating sitting and standing while doing the dishes, by using handrails on the stairs of her home, and by receiving assistance from her husband in shopping. (*Id.* at 809.) Plaintiff testified that she was only able to descend "very light" hills in order to fish. (*Id.* at 812.) She further claimed that she sometimes had to stop her car and walk a bit when her alleged disability bothered her while driving. (*Id.* at 812.)

The VE testified at the hearing regarding his review of the vocational exhibits in Plaintiff's file. (*Id.* at 814–18.) He stated that he would classify Plaintiff's past experience as an assistant manager of a convenience store as semi-skilled, light work. (*Id.* at 814.) The VE then opined on a series of hypothetical questions posed by the ALJ. (*Id.* at 814–18.)

The ALJ first asked the VE to opine about an individual with the same vocational profile, age, and education of Plaintiff who could: (1) lift or carry ten pounds frequently and twenty pounds occasionally; (2) sit, stand, or walk for six out of eight hours; and (3) push and pull without limit. (*Id.* at 814–15.) The VE testified that such an individual could perform Plaintiff's past work in addition to other jobs such as parking lot attendant, unskilled office helper, unskilled rental clerk, or gate tender. (*Id.* at 815.) Upon examination by Plaintiff's counsel, the VE acknowledged that if such an individual also had to take hour-long breaks due to frequent headaches, she would be precluded from performing all work. (*Id.* at 818.)

The ALJ next asked the VE to consider an individual similarly situated to Plaintiff who: (1) could not sit for long periods of time; (2) could not stand for long periods; (3) could lift and carry fifteen to twenty pounds occasionally; and (4) could not crouch or bend forward for any length of time. (*Id.* at 815–16.) The VE testified that such an individual would not be able to perform Plaintiff's past work. (*Id.* at 816.)

The ALJ then asked the VE to consider an individual similarly situated to Plaintiff who: (1) could only lift or carry five to ten pounds; (2) sit for ten minutes at a time; (3) stand for ten minutes at a time; and (3) required ten-to-fifteen minute breaks twice every hour. (*Id.* at 817.) The VE testified that such an individual would be precluded from performing all work. (*Id.*)

Finally, the ALJ asked the VE to opine about an individual situated similarly to Plaintiff who could: (1) walk for ten minutes at a time; (2) sit for fifteen to twenty minutes at a time; (3) stand for fifteen to twenty minutes at a time; (4) occasionally climb a few stairs; (5) occasionally overhead reach; (6) never kneel, stoop, and rarely bend; (7) lift and carry ten pounds occasionally; and (8) required rest periods three times per day for approximately sixty to ninety minutes each.  (*Id.*)  The VE testified that such an individual would be unable to work.  (*Id.*)

On October 24, 2006, the ALJ issued a decision reflecting his finding that Plaintiff was not disabled within the meaning of the SSA because she retained the capacity to perform certain light work.  (*Id*. at 715–22.)  In reaching his decision, the ALJ first found that Plaintiff last met the insured status requirements of the SSA on September 30, 1997.  (*Id.* at 717.)  The ALJ next determined that Plaintiff had not engaged in substantial gainful activity from the date of her automobile accident until the date she was last insured.  (*Id.*)  Third, the ALJ determined that Plaintiff's neck and back strain, and her sacroiliac joint dysfunction with piriformis syndrome, were medically determinable, severe impairments.  (*Id.*)  Despite their severity, the ALJ determined that these impairments were not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4.  (*Id*. at 719.)  The ALJ moreover found that Plaintiff's "complaints of pain and other symptoms to the extent she alleges are not persuasive."  (*Id*. at 719.)

Based on the evidence presented, the ALJ concluded that Plaintiff had the RFC to perform light work.  (*Id* at 722.)  Specifically, the ALJ found that Plaintiff: (1) could sit, stand, or walk for up to six hours in an eight-hour workday; (2) lift and carry up to ten pounds

frequently and up to twenty pounds occasionally; and (3) only occasionally stoop.  (*Id.* at 719.)

In accord with this RFC determination, the ALJ determined that Plaintiff could perform her old

work as a convenience store assistant manager, as well as the jobs of parking lot attendant, office

helper, and gate tender.  (*Id*. at 722.)

On February 15, 2007, the Appeals Council affirmed the ALJ's decision, making it the

final administrative decision for the purposes of judicial review.  (*Id.* at 706–08.)  April 16,

2007, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability

insurance benefits.  (Compl. [filed Apr. 16, 2007].)  On November 8, 2007, Plaintiff filed her

opening brief.  (Pl.'s Opening Br. [filed Nov. 8, 2007] [hereinafter "Pl.'s Br."].)  On December

17, 2007, the Commissioner filed his response.  (Def.'s Resp. Br. [filed Dec. 17, 2007]

[hereinafter "Def.'s Resp."].)  On January 2, 2008, Plaintiff replied.  (Pl.'s Reply Br. [filed Jan.

2, 2008] [hereinafter "Pl.'s Reply"].)  This matter is fully briefed and ripe for review.

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of

the Commissioner's denial of disability insurance benefits and supplemental security income

benefits.  *See* 42 U.S.C § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. §

405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, and where a claim has been denied
> by the Commissioner of Social Security or a decision is rendered under
> subsection (b) of this section which is adverse to an individual who was a party to
> the hearing before the Commissioner of Social Security, because of failure of the

> claimant or such individual to submit proof in conformity with any regulation
> prescribed under subsection (a) of this section, the court shall review only the
> question of conformity with such regulations and the validity of such regulations.

42 U.S.C § 405(g) (2006). Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The

court must uphold the Commissioner's decision if it is supported by substantial evidence. *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient

relevant evidence that a reasonable person might deem adequate to support the ultimate

conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere

scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The

ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v.*

*Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

2.      ***Evaluation of Disability***

The qualifications for disability insurance benefits under the SSA are that the claimant

meet the insured status requirements, be less than sixty-five years of age, and be under a

"disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The SSA defines a disability

as an inability "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006).  In proving disability, a claimant must make a *prima facie* showing that he is unable to return to the prior work he has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits.  *See* 20 C.F.R. § 404.1520 (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing the five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a) (2008); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that he is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b) (2008).  Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities.  *Id.* § 404.1520(c).  At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled.  *Id.* § 404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents him from performing work he has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform his previous work, he is not disabled.  20

C.F.R. § 404.1520(f) (2008); *Williams*, 844 F.2d at 751.  The fifth step requires the

Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on

the claimant's age, education, past work experience; and (2) there is availability of that type of

work in the national economy.  *See* 20 C.F.R. § 404.1520(g) (2008); *Williams*, 844 F.2d at 751.

### 3.    *Disability Determination*

In the instant case, Plaintiff argues that the ALJ's determination of non-disability was

erroneous because he: (1) gave incorrect weight to Dr. Silva's December 2002 RFC assessment;

(2) disregarded evidence of Plaintiff's neck pain and headaches; and (3) erred in assessing

Plaintiff's credibility.  (Pl.'s Br. at 14–29.)  I assess each argument in turn.

#### a.    *Dr. Silva's December 2002 RFC Assessment*

It is well-established that an ALJ is required to give controlling weight to a treating

physician's opinion, so long as it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and not inconsistent with other substantial evidence of record.

*See* 20 C.F.R. § 404.1527(d)(2) (2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.

2004).  Should an ALJ choose to disregard the opinion of a treating physician, the ALJ must set

forth "specific, legitimate reasons" for doing so.  *Hamlin*, 365 F.3d at 1215 (citation and

quotation marks omitted).

In the instant case, Plaintiff argues that the ALJ erred in not giving adequate weight to

Dr. Silva's December 2002 RFC assessment in his letter addressed "To Whom It May Concern."

(*See* Pl.'s Br. at 14–17.)  For the following reasons, I disagree.

In addressing Dr. Silva's December 2002 RFC assessment, the ALJ provided a very detailed discussion of this letter, possibly in recognition of this court's earlier remand for consideration of this precise evidence. (*See* Admin R. at 720–21, 788 [the ALJ acknowledging during the hearing that, "I'm sure going to consider (Dr. Silva's assessment), that's for sure . . . (the district court) specifically said to do that"].) In addressing this assessment, the ALJ first noted that it was inconsistent with a similar assessment the doctor had issued four years earlier. (*Id.* at 720.) As the ALJ noted, Dr. Silva had opined in 1998 that Plaintiff was capable of light work, whereas in 2002, he opined that, since 1996, she had been capable of only sedentary work. (*Id.*) As the ALJ observed, "[u]nforunately, Dr. Silva neglected to explain the differences between his opinion of 1998, and his opinion of 2002." (*Id.*) More significantly, the ALJ also found Dr. Silva's 2002 RFC assessment to be unsupported by the evidence of record. (*Id.*) As the ALJ explained in relevant part:

> Dr. Silva originally diagnosed nothing more than cervical and thoracic muscle strains, attended by headaches, and he prescribed only conservative treatment measures, including massage therapy, physical therapy, injections and medication. Imaging did not indicate any degenerative changes to the cervical or thoracic spine, and [EMG] testing conducted in April 1997, and again in December 1997, also returned normal results. Regarding her low back impairment, Dr. Silva reported in his letter of December 2002 that imaging results subsequent to [Plaintiff's] injury indicated 'a very large L4-5 disc protrusion,' yet his treatment notes from February 10, 1997 indicate that MRI results reflected only early degenerative disease with 'mild leftsided disc bulge.'

(*Id.* at 721 [internal citations omitted].) Based on the "lack of supportive objective evidence indicating more than mild spinal impairment, the fact Dr. Silva prescribed relatively conservative treatment measures, and Dr. Silva's failure to explain the differences between his earlier and

-15-

later assessments," the ALJ concluded that the doctor's December 2002 RFC assessment was entitled to "little weight." (*Id.*) Given this explanation, I find that the ALJ provided "specific, legitimate reasons" for not giving Dr. Silva's December 2002 RFC assessment controlling weight — namely, its inconsistency with the doctor's own previous RFC assessment, and its inconsistency with other substantial evidence of record. *Hamlin*, 365 F.3d at 1215.

In arguing against the above conclusion, Plaintiff makes only imprecise and confused arguments. (*See* Pl.'s Br. at 14–16.) I address each in turn.

First, Plaintiff argues that the ALJ misread Dr. Silva's 1998 RFC assessment, and that this assessment was actually consistent with the doctor's 2002 conclusion that Plaintiff was incapable of light work. (Pl.'s Br. at 21.) Specifically, Plaintiff asserts that, because Dr. Silva imposed sitting and standing limitations on Plaintiff in his 1998 assessment, such restrictions precluded the possibility of light work. (*Id.*) I am not persuaded. The ALJ explicitly addressed these sitting and standing limitations in his decision, noting that Dr. Silva's 1998 assessment had not "assess[ed] specific abilities or limitations in those areas," and taking the doctor's assessment at its word that Plaintiff would be capable of work "in the light duty category." (Admin R. at 277, 720.) Accordingly, Plaintiff's objection on this score implicitly asks me to reweigh the evidence that was before the ALJ, and I find that such reweighing is improper in the instant procedural posture. *See, e.g.*, *Hamilton*, 961 F.2d at 1497–98 (stating that district court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision). Moreover, even if the ALJ had erred in reading Dr. Silva's 1998 assessment, and it were appropriate for me to so decide, I would still find this error harmless in

light of the ALJ's second explanation for why he chose not to afford Dr. Silva's 2002 RFC assessment controlling weight — namely, its inconsistency with other substantial evidence of record.

Second, Plaintiff makes the confused argument that the ALJ's decision to afford Dr. Silva's December 2002 "little weight" was improper because this assessment was consistent with "a number of medical reports" Dr. Silva provided in the late summer and early fall of 1997, and also with Dr. Leimbach's treatment notes. (Pl.'s Br. at 15.) Again, I am not convinced. Even if this were true, it would be irrelevant because an ALJ may properly reject a treating physician's opinion if it is "inconsistent with other substantial evidence of record," whether or not it is consistent with some other evidence. *Hamlin*, 365 F.3d at 1215. Any contrary rule would be unworkable as it would encourage precisely the type of reweighing of the evidence that Plaintiff invites here. *See, e.g.*, *Jordan*, 835 F.2d at 1316 ("This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ."). In the instant case, the ALJ found that Dr. Silva's assessment was inconsistent with multiple objective imagining and EMG studies, and I find that this conclusion is sufficient to show the inconsistency between Dr. Silva's assessment and substantial evidence of record. (*See* Admin R. at 721.) Moreover, despite Plaintiff's intimation to the contrary, I disagree that "a number of medical reports" prove the consistency between Dr. Silva's 2002 RFC assessment and the objective medical evidence. (Pl.'s Br. at 15.) The only relevant evidence Plaintiff cites are the four records of her visits to Dr. Silva between July and September 1997, and my review of these records, as documented above, reveals absolutely

nothing to suggest that Dr. Silva's 2002 RFC assessment was correct.  (*See* Pl.'s Br. at 15; *see also* Admin R. at 284–87.)

Third, Plaintiff vaguely contends that the ALJ erred in rejecting Dr. Silva's December 2002 RFC assessment without discussing the opinions of other medical sources on record.  (*See* Pl.'s Br. at 15.)  In support, Plaintiff lists the names of seven medical sources who appear in the record, and cites the pages of the record containing their respective treatment or evaluation notes.  (*See id.*)  I am unmoved.  The only law Plaintiff cites in support of this "argument" merely recites that the ALJ must evaluate every medical opinion on record, but says nothing about the rationale required to reject a treating physician's opinion, or whether an ALJ must explicitly discuss each physician's opinions in his opinion.  *See, e.g.*, *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *see also* 20 C.F.R. 404.1527(d) (2008) ("We will evaluate every medical opinion we receive.").  The Tenth Circuit has stated that "an ALJ is not required to discuss every piece of evidence," and it is accordingly unclear how the ALJ's failure to discuss each of these medical sources before rejecting Dr. Silva's December 2002 assessment was somehow allegedly erroneous.  *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).  Moreover, the ALJ explicitly stated in his opinion that he had given "careful consideration [to] all the evidence," and Plaintiff has pointed to nothing in any of these records which would buttress Dr. Silva's December 2002 RFC assessment.  (*See* Admin R. at 716.)  Finally, the ALJ explicitly discussed the two most germane medical sources included in Plaintiff's list —  Drs. Freuden and Centeno — and the other sources appear to be largely irrelevant because they either: (1) treated Plaintiff before the onset of her alleged disability; (2) treated her after the

expiration of her insured status; or (3) merely carried out the various imaging and other objective tests ordered by her treating physicians. (*See* Admin R. at 120–24, 204–25, 228, 268–72, 718.) Accordingly, I reject Plaintiff's suggestion that the ALJ erred by not discussing these various medical sources' opinions before rejecting Dr. Silva's assessment.

Based on the foregoing, I find that the ALJ provided "specific, legitimate" reasons for rejecting Dr. Silva's December 2002 RFC assessment, and that Plaintiff has failed to demonstrate any error in the ALJ's evaluation of this assessment.

### b. The ALJ's Disregard of Plaintiff's Neck Pain and Headaches

Plaintiff next argues that the ALJ's RFC determination was erroneous because he did not include sufficient limitations on her ability to use her neck, such as her purported need to take frequent breaks from work because of her headaches. (*See* Pl.'s Br. at 17–19.) Specifically, Plaintiff charges that the ALJ "completely ignored [her] complaints of neck pain and disregards her headache complaint," and that he consequently failed to base his RFC determination upon substantial evidence. (*See id.* at 17; *see also* Pl.'s Reply at 3–4.) I disagree.

First, in claiming that the ALJ utterly failed to discuss her neck pain and headache complaints, Plaintiff blatantly misrepresents the record. For instance, in her reply, Plaintiff claims that "[i]n his discussion of which complaints of [Plaintiff] are severe impairments, *i.e.*, the analysis required at Step 2 of the sequential evaluation process . . . [the ALJ] [did] not discuss [Plaintiff's] cervical complaints and headaches." (Pl.'s Reply at 3.) This is untrue. Not only did the ALJ discuss these complaints at length, but he actually found Plaintiff's neck strain

to be a medically determinable, severe impairment. (*See* Admin R. at 717–18.) As the ALJ stated:

> The evidence indicates that claimant was initially diagnosed with cervicothoracic sprain/strain syndrome . . . resulting in headaches . . . . [B]y February 1997 her treating physician [Dr.] Silva, DO, noted that she had shown improvement in her cervical strain symptoms, and that she was having fewer headaches with less intensity. And, by April 30, 1997, [Plaintiff] reported that her headaches, which were occurring even less often, were alleviated by her pain pills, and that her upper shoulder and neck pains were completely relieved with massage. Nevertheless, as the evidence indicates that [Plaintiff's] cervicothoracic strain resulted in more than minimal functional limitations for just over twelve consecutive months, it is considered a severe impairment for that period of time.

(Admin R. at 718. [citations omitted].) Accordingly, I find Plaintiff's allegation that the ALJ failed to consider her neck pain and headaches to be untrue and inexplicable.

Second, again contrary to Plaintiff's representations, the ALJ specifically addressed whether Plaintiff's neck pain and headaches affected her RFC at step four of the sequential evaluation process. As the ALJ explained in relevant part:

> The undersigned finds that [Plaintiff's] complaints of pain and other symptoms to the extent which she alleges are not persuasive. For example, she testified at the hearing that she still has extreme headaches, with any extended use of her head and neck in a downward position. . . . In considering these alleged symptoms and limitations, the undersigned notes some inconsistences. . . . She reported that her medications do take the edge off her pain, and testified she suffers no side effects from these medications. . . . She further testified that she actually experiences a headache only about once per month, and that she takes over the counter medication for these symptoms. Considering the level of activity to which [Plaintiff] testified that she performs, and the inconsistencies in her testimony, along with the lack of objective evidence so severe as to preclude physical activity to the extent she alleges, the undersigned gives little credibility to her allegation of complete disability from any exertional level of work. . . .
>
>                       \*     \*     \*
>
> Considering that [Plaintiff] was found not to be credible regarding her complaints of pain, the undersigned gives little weight to the suggestion that the claimant

would have required more than the standard rest periods provided in a usual work setting.

(Admin R. at 720.)  Given this explanation, I find the ALJ's decision not to include any limitation on Plaintiff's neck movement such as the need for frequent breaks into his RFC determination was supported by substantial evidence.  *See Dollar*, 821 F.2d at 532 (10th Cir. 1987) (stating that the district court must uphold the Commissioner's decision if it is supported by substantial evidence); *see also Kelly v. Chater*, 62 F.3d 335, 338 (affirming an ALJ's determination of non-disability where a disability claimant's disease was "well-controlled" by medication).

### c.        The ALJ's Credibility Assessment of Plaintiff's Testimony

Lastly, Plaintiff contends that the ALJ erred in assessing her credibility.  (Pl.'s Br. at 19–22.)  "Credibility is the province of the ALJ."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1376 (10th Cir. 1992) (citation and quotation marks omitted).  Credibility determinations made by an ALJ are generally considered binding upon review.  *Gossett v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if supported by substantial evidence." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).

In the instant case, the ALJ found Plaintiff's self-reported restrictions to be less than credible in part because of inconsistency between these restrictions and her testimony regarding her abilities.  (*See* Admin R. at 720.)  As the ALJ explained:

> For instance, [Plaintiff] testified that she is still able to drive on a regular basis, she can drive for up to one hour without problems, and she is able to pump her own gas.  She requires no assistive device with ambulation and, although he initially testified that she last went fishing seven years ago, she later admitted that

> she still fishes occasionally, and she renews her fishing license yearly, and she still goes camping on a regular basis. . . . She admitted that she is able to engage in some light household chores, including cooking, doing dishes, and doing the laundry, as long as she is able to alternate between sit and stand, and that she has two dogs for which she provides care.

(*Id.*) Based on such inconsistencies, and "the lack of objective evidence of any impairment so severe as to preclude physical activity to the extent she alleges," the ALJ found Plaintiff's testimony regarding her self-reported restrictions to be less than credible. (*Id.*) Given this explanation, I find that the ALJ's credibility determination was supported by substantial evidence.

In counseling against the above conclusion, Plaintiff primarily claims that the ALJ mischaracterized her testimony, and that a proper reading of her testimony reveals that the purportedly inconsistent statements were not inconsistent at all. (*See* Pl.'s Br. at 19–22.) For instance, Plaintiff advances the utterly ridiculous argument that Plaintiff's admission that she "might throw a lure a couple times,""does not contradict" her testimony that she had not fished in seven years. (Pl.'s Br. at 27; *see also* Admin R. at 805.) Similarly, Plaintiff claims that the ALJ mischaracterized her purported admission that she can drive for up to an hour because "she . . . went on to explain that her husband usually drives, that she tilts the seat back while they are driving, and that some times [sic], when her condition is bad, she must get out and walk around." (Pl.'s Br. at 20.) I find no such mischaracterization. In the hearing, Plaintiff actually testified as follows:

> ALJ: How much driving do you do?
> PL: Oh, it's limited. My husband does most of the driving.
> ALJ: That's not what I asked you. How much do you do?

PL:     Well, short runs into town.  I — couple times a week, I'd say.
ALJ:    How far can you drive without any big problem?
PL:     I can usually go about an hour.

(Admin R. at 801.)  The fact that Plaintiff later testified upon examination by her counsel that

she also tilted back the seat while her husband drove is irrelevant to her above admission.  (*See*

*id.* at 812–13.)  Similarly, the fact that Plaintiff later testified that she sometimes got out of her

car to stretch her legs merely reinforces the ALJ's determination that her testimony was less than

credible due to internal inconsistencies.  (*See id.*)  In short, I find no error in the ALJ's

assessment of Plaintiff's credibility.

*4.*     *Conclusion*

         Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

AFFIRMED.

         Dated this 24th day of June, 2008.

                                                  BY THE COURT:


                                                  s/ Edward W. Nottingham
                                                  EDWARD W. NOTTINGHAM
                                                  Chief United States District Judge